**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD SCOTT MAGEE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | 2:13-cv-94 |
| | ) | Electronic Filing |
| **CAROLYN W. COLVIN,**[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

### I.     INTRODUCTION

Richard Scott Magee ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of the final determination of the Commissioner of Social Security

("Commissioner") denying his applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act").

42 U.S.C. §§ 401-433, 1381-1382f.  The record has been developed at the administrative level.

Presently before the court are cross-motions for summary judgment.  For the reasons set forth

below, plaintiff's motion will be denied and Commissioner's motion will be granted.

### II.     PROCEDURAL HISTORY

Plaintiff filed his current application for benefits two months after his previous

application was denied by the Commissioner.  Plaintiff initially filed applications for DIB and

SSI on October 12, 2007, alleging disability as of November 26, 2006.  This claim was denied on

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former Commissioner Michael J. Astrue.  Social Security History-Social Security Commissioners, http://www.ssa.gov/history/commissioners.html (as visited on August 13, 2013). Consequently, Acting Commissioner Colvin is now the official-capacity defendant in this action. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); FED. R. CIV. P. 25(d).

September 9, 2008.  Plaintiff's request for review was granted, and a hearing was held before Administrative Law Judge ("ALJ") Brian W. Wood on September 14, 2009.  On October 7, 2009, the ALJ issued a decision denying plaintiff's application.  The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Plaintiff filed a Complaint in this court on July 2, 2010.  After considering cross-motions for summary judgment, District Judge Nora Barry Fischer affirmed the ALJ's decision.  *See Magee v. Astrue*, 2010 WL 5186726 (W.D. Pa. Dec. 15, 2010).

Plaintiff protectively filed the instant applications on December 7, 2009, alleging disability due to bipolar disorder and depression as of November 15, 2006.  After the applications were denied administratively, plaintiff requested an administrative hearing and a hearing was held before ALJ John J. Porter on May 25, 2011.  On June 23, 2011, the ALJ ruled against plaintiff.  The Appeals Council denied plaintiff's request for review on November 20, 2012, making the ALJ's decision the final decision of the Commissioner.  The instant action followed.

### III.    STATEMENT OF THE CASE

### A.    General Background

Plaintiff was born on February 20, 1961.  R. 32.  He was 45 years of age as of his alleged onset date.  Plaintiff has a high school diploma and completed welding training in 1980.  R. 53-54, 305.  He has never been married and has no children.  R. 305.  He has been living with his aging but self-sufficient parents in their home in Butler, Pennsylvania since 2007.  R. 36, 45.  Although they live together and plaintiff described his parents as his only support system, plaintiff reported having little contact with his father.  R. 43, 272.  This is due to reported physical abuse while growing up.  R. 272.  Plaintiff's mother does all of his cooking, cleaning

and shopping.  R. 40.  Plaintiff mows his parents' lawn.  *Id.*  Plaintiff testified he would likely be

able to cook, clean and shop if he were living on his own, but that such activities would not

occur as frequently as they do at his parents' house and he probably would not do laundry until

he ran out of clean clothes.  *Id.*

Plaintiff was working as a part-time delivery driver for Thoma's Meat Market

("Thoma's"), where he had been employed for over four years.  R. 32.  In this capacity he

worked between five and seven hours per day, three days per week, and earned $11.35 per hour.

R. 32-33.  His typical work day consists of loading a delivery truck with boxes and delivering

them to the proper recipients.  R. 33.  Over the past few years plaintiff generally has not worked

more than three days per week or more than five to seven hours per day.  R. 34.  Plaintiff

testified that he does not believe he would be able to work 40 hours per week because when he

tried to do so he would stay in bed and miss work because he did not "feel like going."  *Id.*  He

also reported experiencing confusion while making deliveries, resulting in driving past delivery

locations and taking the wrong routes.  R. 35, 49.

Plaintiff maintains a good attendance record at work.  He has been absent only two days

in the past two years.  R. 35, 46.  He attributes his good attendance to his mother, who will wake

him up if he oversleeps and insist that he go to work.  R. 46.  Plaintiff testified he suffers from

low energy and a lack of motivation to do things, which has resulted in poor attendance at

previous jobs, and he would probably miss work at least once a week without his mother's

influence.  R. 46-47, 50-51.

Plaintiff has two supervisors at work.  R. 42.  One of them is his friend.  *Id.*  That

supervisor was aware of plaintiff's mental health conditions before he was hired and makes

accommodations for him.  R. 43.  Plaintiff has had conflicts with his other supervisor, his

friend's partner. R. 44. There have been times when plaintiff's friend has had to intervene to mediate conflicts between the two. *Id.* This type of conflict is not uncommon for plaintiff. He reported having had similar problems with supervisors at other jobs and having been fired from jobs due to such problems. R. 45. He also reported having been fired from jobs due to poor attendance, which he attributes to depression. *Id.*

On the days he is not working, plaintiff usually sits at home, watches television and plays on the computer. R. 43. He spends the vast majority of his time alone in his bedroom, sometimes emerging only for dinner. R. 48. Plaintiff will spend entire days in bed. *Id.* Plaintiff is a member of a nine-hole league and goes golfing once a week. R. 41. Plaintiff used to go bowling twice a week, but gave it up due to lack of continued interest. *Id.* Plaintiff abused alcohol and cocaine in his early 20s. R. 38-39. He presently consumes small amounts of alcohol and has ceased using cocaine. R. 39-40.

### B.  Mental Health Background

### 1.  Butler Memorial Hospital Treatment Notes dated February 19, 2007 to February 22, 2007

On February 19, 2007, plaintiff sought inpatient mental health treatment at Butler Memorial Hospital ("Butler Memorial"). R. 270. He presented with "increasing depression in the context of being unable to afford his medications for his bipolar illness and multiple psychosocial issues." *Id.*

John Soffietti, M.D., completed plaintiff's initial neuropsychiatric evaluation. R. 272. On examination Dr. Soffietti described plaintiff as being alert, fluent, and sad, and noted that plaintiff had a slowed psychomotor. R. 273. Plaintiff denied flight of ideas or psychotic symptoms and did not manifest any thought disorder, but did report feeling helpless and hopeless. *Id.*

Dr. Soffietti further noted that plaintiff had been diagnosed with bipolar disorder during previous outpatient sessions. *Id.* He initially had been treated with lithium,[2] but could not afford the extensive blood work associated with that treatment. *Id.* Physicians then prescribed Paxil[3] in conjunction with Lamictal.[4] *Id.* Although he had doubts about the efficacy of the combination therapy, plaintiff noted that those around him agreed that his condition improved because of it. *Id.* Plaintiff discontinued the combination therapy due to financial limitations. *Id.*

Dr. Soffietti placed plaintiff on lithium and Lamictal, which he tolerated without difficulty or adverse effects. *Id.* Treatment notes indicate that by the time of his discharge, plaintiff's mood had improved, and he was less depressed, more hopeful, had increased energy levels and decreased anhedonia. R. 270. Following a diagnosis of Bipolar II Disorder, depressed, without psychotic features, plaintiff was discharged to his home as medically and

---

[2] "Lithium affects the flow of sodium through nerve and muscle cells in the body. Sodium affects excitation or mania. Lithium is used to treat the manic episodes of manic depression. Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger. It also helps to prevent or lessen the intensity of manic episodes." Drugs.com, Lithium, *available at:* http://www.drugs.com/lithium.html (last visited 10/24/13).

[3] "Paxil (paroxetine) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Paroxetine affects chemicals in the brain that may become unbalanced. Paxil is used to treat depression, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder (PTSD), and premenstrual dysphoric disorder (PMDD)." Drugs.com, Paxil, *available at:* http://www.drugs.com/paxil.html (last visited 10/24/13).

[4] "Lamictal (lamotrigine) is an anti-epileptic medication, also called an anticonvulsant. Lamictal is used either alone or in combination with other medications to treat epileptic seizures in adults and children. Lamictal is also used to delay mood episodes in adults with bipolar disorder (manic depression)." Drugs.com, Lamictal, *available at:* http://www.drugs.com/lamictal.html (last visited 10/24/13).

psychiatrically stable with a recommendation that he follow up at Irene Stacy Community Mental Health Center ("Irene Stacy").  R. 270-271.

### 2.   Outpatient Treatment at Irene Stacy Community Mental Health Center

Plaintiff followed-up with outpatient mental health treatment at Irene Stacy.  He testified that he attended all scheduled appointments, was truthful about his symptoms, and adhered to the medication regimen prescribed by treating clinicians.  R. 36.

On August 24, 2007, a clinician at Irene Stacy completed an Employability Re-Assessment Form ("ERAF") for the Pennsylvania Department of Public Welfare.  R. 330.  The ERAF indicated that plaintiff previously had provided an Employability Assessment Form documenting that he could not work due to a temporary disability, and that he was now requesting a continuation of assistance, an exemption from work requirements, or had reapplied for assistance.  *Id.*  The ERAF directed the clinician to assess whether plaintiff remained disabled due to a temporary or permanent condition and whether the disability temporarily or permanently precluded any gainful employment.  *Id.*  Based on a review of medical records, the clinician noted that plaintiff continued to be disabled temporarily because of depressive symptoms, and that the temporary disability began on September 12, 2007 and was expected to last until September 12, 2008.  *Id.*

On September 24, 2008, Debbie Lovewell, C.S.W., plaintiff's treating therapist at Irene Stacy, completed a questionnaire regarding his mental health.  R. 311-315.  According to Lovewell, plaintiff was not able to sustain full-time employment because he often becomes depressed with poor sleep pattern and experiences anhedonia, anergia, low motivation and fatigue.  R. 312.  Lovewell also confirmed the pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or

retardation, feelings of guilt or worthlessness, difficulty concentrating or thinking and flight of ideas. R. 313-314. She found moderate degrees of limitation in the activities of daily living and maintaining social functioning; frequent deficiencies of concentration, persistence, or pace resulting in the failure to complete tasks in a timely manner (in work settings or elsewhere); and repeated (three or more) episodes of deterioration or decompensation, each of extended duration. R. 315. Plaintiff's treating psychiatrist at Irene Stacey, Randon Simmons, M.D., signed off on Lovewell's questionnaire on September 25, 2008. *Id.*

At an outpatient visit on November 3, 2008, plaintiff rated his mood at five out of ten. R. 262. He testified at the administrative hearing that a five out of ten means "an average, like I'll feel sluggish but I'll still be able to function but I still [am] not full functional. I still don't do things. I still don't feel like them but I'll do them because I have to do them." R. 48-49. Treatment notes indicate that plaintiff's irritability had improved but that sleep continued to be problematic. *Id.* No changes in plaintiff's medication regimen were ordered. *Id.*

During an outpatient visit on February 3, 2009, plaintiff rated his mood at five-and-a-half to six-and-a-half out of ten. R. 261. Treatment notes indicate that plaintiff was looking forward to better weather and had been enjoying his parents being away in Florida for three months. *Id.* Treatment notes further indicate that plaintiff had been working full-time at Thoma's from Thanksgiving to the date of his appointment, but he planned to return to three days per week. *Id.* Notably, plaintiff's clinician denoted a brighter affect. *Id.* No changes in plaintiff's medication regimen were ordered. *Id.*

On July 15, 2009, plaintiff reported his mood to be six out of ten. R. 260. Plaintiff testified that a six out of ten means "a much better day. I'd wake up, want to go to work, [want] to go do something after work maybe but not too often, I mean, I just go back home after work

and turn the T.V. on and sit there and either stare at it or watch it." R. 49. Treatment notes indicate that plaintiff was still playing golf and his sleep continued to be "on and off." R. 260. No changes in medication were ordered. *Id.*

On September 9, 2009, Dr. Simmons completed another ERAF. R. 328. Based on a review of medical records and clinical history, Dr. Simmons noted that plaintiff continued to be disabled temporarily because of symptoms of Bipolar II Disorder, and that the temporary disability began on September 10, 2009 and was expected to last until September 10, 2010. *Id.*

On January 11, 2010, plaintiff rated his mood at five out of ten. R. 258. Treatment notes indicate that plaintiff spent time watching television, had been working three days per week and went bowling one night a week. R. 258. Plaintiff also stated that he did not enjoy the holidays, but that he had resolved some stress in the prior year and was sleeping better. *Id.* No changes in medication were ordered. *Id.*

On April 20, 2010, plaintiff rated his mood at five to five-and-a-half out of ten. R. 337. He reported that golf and bowling "no longer holds a thrill" for him. *Id.* He also indicated that his medication had not improved his condition. *Id.* Dr. Simmons prescribed Abilify,[5] to be discontinued if no improvement was noted in two weeks. *Id.*

On September 14, 2010, plaintiff rated his mood at five out of ten and still felt sluggish. R. 335. He reported no noticeable difference on Abilify, low energy levels and stated he was bowling and golfing less. *Id.* No changes in his medication regimen were ordered. *Id.*

---

[5] Abilify (aripiprazole) is an antipsychotic medication. Abilify is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression). It is also used together with other medications to treat major depressive disorder in adults as well as irritability and symptoms of aggression, mood swings, temper tantrums, and self-injury related to autistic disorder in children who are at least 6 years of age. Drugs.com, Abilify, *available at:* http://www.drugs.com/abilify.html (last visited 10/28/13).

On December 29, 2010, plaintiff conveyed that he was moody, irritable, snapping at people and felt like he was "back to where I was three years ago when I started coming [to Irene Stacy]." R. 334. He rated his mood at four to five out of ten, noting a loss of interest in doing things and being around people. *Id.* He recently quit bowling due to lack of continued interest, and had an argument with his boss which caused him to almost walk out of work. *Id.* His medication regimen was augmented with Zoloft,[6] in increasing dosage amounts. *Id.*

On February 21, 2011, Dr. Simmons completed another ERAF. R. 326. Based on a review of medical records and clinical history, Dr. Simmons indicated that plaintiff continued to be disabled temporarily because of symptoms of Bipolar II Disorder, and that the temporary disability began on February 23, 2011 and was expected to last until February 23, 2012. *Id.*

On February 28, 2011, plaintiff rated his mood at six out of ten. R. 333. Treatment notes indicate he was tolerating a 100 mg dose of Zoloft, reported feeling better on it, and requested to continue at 100 mg of Zoloft with 200 mg of Lamictal and Wellbutrin.[7] *Id.*

On March 28, 2012, a clinician at Irene Stacy completed another ERAF. R. 358. Based on a physical examination, the clinician noted that plaintiff remained temporarily disabled because of symptoms of Bipolar II Disorder, and that the temporary disability began on March 26, 2012 and was expected to last until March 26, 2013. *Id.*

### 3. Consultative Examination Report dated January 9, 2008

[6] Zoloft (sertraline) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Sertraline affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms. Zoloft is used to treat depression, obsessive-compulsive disorder, panic disorder, anxiety disorders, post-traumatic stress disorder (PTSD), and premenstrual dysphoric disorder (PMDD). Drugs.com, Zoloft, *available at:* http://www.drugs.com/zoloft.html (last visited 10/28/13).

[7] Wellbutrin (bupropion) is an antidepressant medication. It works in the brain to treat depression. Wellbutrin is used to treat major depressive disorder and seasonal affective disorder. Drugs.com, Wellbutrin, *available at:* http://www.drugs.com/wellbutrin.html (last visited 10/28/13).

Suzanne Houk, Ph.D., personally evaluated plaintiff at Houk Psychological Services on January 9, 2008. R. 302. She indicated that he was first diagnosed with bipolar disorder, depressive type, in 2002. R. 303. At the time of this evaluation plaintiff was taking 200 mg of Lamictal and 150 mg of Wellbutrin. *Id.* Dr. Houk noted that plaintiff reported poor concentration and that he became easily preoccupied and forgetful. R. 304. Plaintiff also stated that he has racing thoughts all the time, worries "about stupid stuff" and feels on edge when he is around a lot of strange people because he believes they are evaluating him negatively. *Id.* Plaintiff appeared pleasant; cooperative; and oriented to person, place and time, but mildly anxious. R. 305. Dr. Houk's impressions included Bipolar II Disorder, history of cocaine abuse and history of alcohol abuse. R. 306.

According to Dr. Houk, plaintiff had slight restrictions in his ability to understand, remember and carry out short, simple instructions. R. 309. Plaintiff had moderate restrictions for the following work-related mental activities: understand and remember detailed instructions, carry out detailed instructions, make judgments on simple work-related decisions, interact appropriately with the public, interact appropriately with co-workers and respond appropriately to changes in a routine work setting. *Id.* Plaintiff had marked restrictions in his ability to interact appropriately with supervisors and respond to pressures in a work setting. *Id.*

### 4. Psychiatric Evaluation with Medical Source Statement dated August 29, 2009

On August 24, 2009, board certified psychiatrist, Robert Eisler, examined plaintiff. R. 321. Dr. Eisler made the following assessments. With respect to occupational adjustments, plaintiff possessed poor or no ability to follow work rules, use judgment, interact with supervisor(s), and deal with work stresses; plaintiff possessed fair ability to relate to co-workers, deal with the public, and maintain attention and concentration, and good ability to function

independently. With respect to making performance adjustments, plaintiff had poor or no ability to understand, remember and carry out complex job instructions, and fair ability to understand, remember and carry out detailed, but not complex job instructions, and to understand, remember and carry out simple job instructions. With respect to personal-social adjustments, plaintiff had poor or no ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Plaintiff had the ability to maintain personal appearance. R. 323-324. Dr. Eisler diagnosed plaintiff with Rapid Cycling Bipolar Reactions, and concluded that plaintiff would be unemployable in any full-time job for one year or more. R. 322.

**5. Mental Residual Functional Capacity Assessment and Psychiatric Review Technique dated February 24, 2010**

On February 24, 2010, Manella Link, Ph.D., evaluated plaintiff's case file and completed a Mental Residual Functioning Capacity Assessment and Psychiatric Review Technique. R. 285-300. Based on the medical evidence of record Dr. Link found plaintiff's statements to be partially credible. R. 287. She indicated he could function without supervision and exhibited no problems in his ability to engage in social interaction. *Id.* Dr. Link further observed that driving a truck for income demonstrated plaintiff's ability to engage in independent decision making. *Id.*

Dr. Link advised that plaintiff was not significantly limited in the following areas: the ability to remember locations and work-like procedures, the ability to understand and carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, the ability to ask simple questions or request assistance, and the ability to travel in unfamiliar places and use public transportation. R. 285-286.

In contrast, Dr. Link indicated plaintiff was moderately limited in the following areas: the ability to maintain attention and concentration for extended periods; the ability to perform

activities within a schedule, maintain regular attendance and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in the work setting. *Id.*

According to Dr. Link, plaintiff had no restriction in the activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and insufficient evidence of repeated episodes of decompensation. R. 298. From Dr. Link's perspective, the medical evidence established a medically determinable impairment of Mood Disorder, NOS, but one that did not precisely satisfy the diagnostic criteria used to determine Affective Disorders. R. 291. Ultimately, Dr. Link concluded that plaintiff was able to meet the basic mental demands of competitive work on a sustained basis. R. 287.

## IV.     STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial

evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United

States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the court's review is limited to the four corners of the ALJ's decision.

14

## V.    THE ALJ'S DECISION

The ALJ determined that although plaintiff's ability to engage in substantial gainful activity is restricted by limitations from the severe impairment of bipolar disorder, plaintiff retained the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) that is limited to work of a semi-skilled nature with no more than occasional interaction with supervisors, coworkers and the general public.  Consistent with the testimony provided by the vocational expert, the ALJ determined that although plaintiff was unable to perform his past relevant work as a carpenter, considering his age, education, work experience and RFC, plaintiff could perform the requirements of representative occupations such as hand packer, cleaner and laundry worker.  Accordingly, the ALJ concluded that plaintiff had not been under a disability between November 15, 2006 and June 23, 2011, the date of the decision.  20 C.F.R. §§ 404.1520(g), 416.920(g).

In reaching this determination, the ALJ used the criteria for the listed impairment of Affective Disorders to rate the severity of plaintiff's mental impairment and determined that plaintiff had mild restrictions in the activities of daily living; moderate difficulties in social functioning; mild difficulties in concentration, persistence and pace; and no episodes of decompensation.  Within this framework, he highlighted plaintiff's attendance record at work, ability to maintain a work schedule for three months without assistance from his mother, ability to interact with his supervisors and belief that they were pleased with his work, ability to concentrate on and complete the delivery tasks assigned at work, weekly social activities, ability to watch television and use a computer, and the lack of any episodes of decompensation to support his assessment.

In formulating plaintiff's RFC, the ALJ assessed the limitations claimed by plaintiff and found them to be ones that could reasonably be expected from plaintiff's impairment, but that plaintiff's statements and arguments as to the intensity, persistence and effects on functioning were only partially credible. He highlighted the lack of corroborating reports of such dysfunction in the treatment records, the baseline functioning reflected in a longitudinal review of those records, and plaintiff's testimony verifying his ability to perform his job adequately and meet the rigors of work-related activity on a sustained (albeit part-time) basis without significant absences and during a time when his mother was away.

The ALJ discounted arguments by counsel suggesting that plaintiff had little or no ability to interact with supervisors, deal with work stressors or behave in an emotionally stable manner for essentially the same reasons. He also declined to assign significant weight to the ERAFs completed by Dr. Simmons on the grounds that they were check-the-box forms that were not supported by any specific information, did not contain a correlating definition of disability and did not indicate the disability was permanent. He also noted that the ultimate conclusion of disability was not supported by the treatment notes, mental status examinations or plaintiff's activities of daily living, which included working at a level that was very close to substantial gainful activity.

## V.    DISCUSSION

### A.  Judicial Review of the Previously Adjudicated Period is Barred by Principles of *Res Judicata*

Plaintiff argues that the ALJ "in effect ignored all of the evidence prior to October 7, 2009 due to *res judicata*" and that such evidence was relevant in determining his present limitations due to his mental health impairments. Specifically, the ALJ improperly disregarded the import of the medical opinions from Dr. Simmons, plaintiff's treating physician, and the

reports of the consulting physician Dr. Eisler and the consulting psychologist Dr. Houk. The Commissioner maintains that the medical evidence being referenced by plaintiff, and more specifically the medical opinions of Dr. Houk and Dr. Eisler, was from and pertained to the prior period of disability, was found to be insufficient to support plaintiff's prior claim for disability and was rejected by the ALJ.

Plaintiff's position requires consideration of two important principles. On the one hand, it is true that a claimant's medical history will almost always be relevant in determining his or her present day limitations from ongoing severe impairments. It does not follow, however, that an ALJ commits reversible error when he declines to review and discuss medical evidence which essentially is identical to the medical evidence submitted in support of a previously adjudicated claim. Requiring as much would amount to forcing a *de facto* review of a prior adjudication when the ALJ's administrative decision not to do so has been placed beyond the court's jurisdiction though the principles of *res judicata*.

On the other hand, an ALJ cannot ignore the import of essential medical evidence as it relates to the existence of impairments and any concomitant limitations as they relate to the period of disability under review. The existence of impairments and the evaluation of the limitations resulting therefrom during any given timeframe cannot be conducted in a vacuum or with the precision of a world-renowned surgeon. Thus, an ALJ may and indeed often must consider evidence from a prior denial for the purpose of developing the essential facts and longitudinal medical history needed to determine whether the claimant was disabled during any time covered in a subsequent application.

Careful consideration of the record demonstrates that the ALJ struck the proper balance between these principles. He effectively utilized the principles of *res judicata* to avoid revisiting

issues that had become final.  And he sufficiently developed plaintiff's medical history in order to consider plaintiff's ability to engage in substantial gainful activity during the timeframe under review.

The principles of *res judicata* apply to administrative adjudications.  *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394 (1966).  These principles provide an important measure of finality to administrative determinations, and more particularly, to decisions of the Social Security Administration.  *See, e.g., Coulter v. Weinberger,* 527 F.2d 224, 228 (3d Cir. 1975); *Domozik v. Cohen,* 413 F.2d 5, 7–8 (3d Cir. 1969).

When a claimant files successive applications, *res judicata* may be invoked by the agency to avoid entertaining a subsequent request based on the same issues.  20 C.F.R. § 404.957(c)(1); *Purter v. Heckler,* 771 F.2d 682, 691 (3d Cir.1985).  *Res judicata* properly can be invoked to preclude a subsequent claim only where the "same" claimant has filed a previous application based on the "same" issues and the prior determination has become final by virtue of administrative or judicial action.  *Purter*, 771 F.2d at 691.[8]  Even where *res judicata* can be applied, the Commissioner retains the discretion to reopen a prior application for "good cause."  20 C.F.R. §§ 404.988(b), 404.989.

A decision by the Commissioner not to reopen a claim is not subject to judicial review.  *Califano v. Sanders*, 430 U.S. 99 (1977); *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987).  Courts of review nevertheless retain the authority to examine the record and determine whether a "reopening" has occurred.  *Coup*, 834 F.2d at 317; *Purter*, 771 F.2d at 695; *Kane v. Heckler*, 776 F.2d 1130, 1132 (3d Cir. 1985).

---

[8]  In general, "the party asserting the defense [of *res judicata*] must demonstrate that (1) there has been a final judgment on the merits in a prior suit; (2) the prior suit involves the same parties or their privies and (3) the subsequent suit is based on the same causes of action."  *Id.* (citing *United States v. Athlone Industries, Inc.*, 746 F.2d 977, 983 (3d Cir. 1984).

A reopening, and thus a waiver of *res judicata*, will be found "where the administrative process does not address an earlier decision, but instead reviews the entire record in the new proceeding and reaches a decision on the merits*." Kaszer v. Massanari*, 40 Fed. Appx. 686, 690 (3d Cir. 2002) (quoting *Kane*, 776 F.2d at 1132). Where the ALJ explicitly addresses the issue of reopening and rests the decision not to do so on *res judicata*, review of the administrative determination is foreclosed under *Califano*. *Kaszer*, 40 Fed Appx. at 692 ("If the ALJ had explicitly decided not to reopen Kaszer's first application, and Kaszer argued on appeal that the ALJ's decision was wrong, then we would not have jurisdiction because we cannot review the propriety of the ALJ's decision.") (citing *Califano*, 430 U.S. at 107-09 and *Coup*, 834 F.2d at 317).

To gain the benefit of preclusion an ALJ must specifically "'address' the earlier decision *vis-a-vis* res judicata." *Id.* In other words, "the [ALJ] must address whether the prior adjudication will be used for its preclusive effect or whether it will be reopened." *Id.* (citing *Coup*, 834 F.2d at 317). Merely indicating that the prior claim is not being reopened or a perfunctory statement to the effect that the prior decision is not being reviewed is not adequate. *Id.*

A *de facto* reopening may occur even where an ALJ makes an explicit determination not to reopen a prior claim but does so in a manner that is insufficient to gain the benefit of *res judicata*. *Id.* Such a reopening occurs where the ALJ essentially considers the entirety of the prior claim on its merits and renders a decision that is based on that review of the merits, even if the decision purportedly is limited to a new period of benefits. *Id.* at 695. "Careful consideration" or an "extensive analysis" of the prior medical evidence for a period as to which no benefits could have been granted are actions sufficient to reopen a prior application *de facto*.

*Id.* ("Similarly, the ALJ here analyzed Kaszer's medical history and supported her decision by 'careful consideration of all the evidence . . . such that her actions were sufficient to reopen Kaszer's first application *de facto*.") (citing *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987) (finding a reopening where "[t]he ALJ made an extensive analysis of the claimant's medical condition ... [for] a period as to which no benefits could have been awarded absent a reopening") and *Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001) ("*Res judicata* does not apply when an ALJ later considers 'on the merits' whether the claimant was disabled during an already-adjudicated period.").

Plaintiff's first and second applications for benefits alleged the same disabilities, bipolar disorder and depression, with essentially the same onset date, November 2006. Plaintiff submitted for consideration much if not all of the same medical evidence submitted in the prior application to support his subsequent claim. Very little additional evidence was added to the prior record. The claims are therefore sufficiently similar and at the very least there is a substantial overlap of medical evidence between the prior adjudicated claim and the current one. Plaintiff's first application for benefits was reviewed on the merits by an ALJ. The adverse decision was appealed to this court and an opinion and order affirming the decision were rendered on December 15, 2010.

These circumstances are more than sufficient to establish that the parties were the same, there was a virtual overlap of the issues and a prior adverse adjudication on those issues had become final. Thus, there was an adequate basis for the ALJ and by extension the Commissioner to invoke the principles of *res judicata*.

Moreover, the ALJ effectively invoked the principles of *res judicata* and precluded a reopening of the prior application. The ALJ specifically noted:

> Although Ms. Nebel requested that the undersigned revisit the prior decision
> because it is allegedly wrong, the undersigned finds, that there are no grounds for
> doing so. Ms. Nebel's argument is frivolous. Therefore, *res judicata* applies to
> the period up to the date of the last decision. Any discussion of evidence prior to
> October 7, 2009 is for contextual purposes only and does not constitute a
> reopening of the prior claim.

R. at 12. The ALJ unequivocally addressed the prior decision "*vis-a-vis* res judicata." He

expressly indicated the prior adjudication was being used for its preclusive effect and was not

being reopened.

It is difficult to contemplate how the ALJ could have rendered a more direct assessment

of plaintiff's request to "revisit" the prior adjudication. His finding was clear and his invocation

of *res judicata* to preclude reopening of the prior decision even clearer. Addressing the issue in

such a manner was sufficient to gain the benefit of *res judicata* and place review of the prior

claim beyond the scope of review on the current claim. *Compare Labate-Watterson v. Colvin*,

2013 WL 4041962, *3 (W.D. Pa. Aug. 7, 2013) (Ambrose, J.) ("Here, the ALJ explicitly

addressed the earlier, unfavorable DIB decision (May 2002) and, finding no good cause to

reopen, concluded that subsequent applications were time-barred procedurally due to the legal

doctrine of administrative finality. Therefore, there is no de facto reopening because the ALJ

never reached a decision on the merits of Plaintiff's DIB claims.") (citing *Haas v. Bowen*, 694 F.

Supp. 85, 87 (M.D. Pa. 1987)); *Hickman v. Astrue*, 2011 WL 6179942, *9 (W.D. Pa. Dec. 13,

2011) (Lenihan, M.J.) (Refusing to find a *de facto* reopening and giving *res judicata* effect to a

prior determination where the ALJ explicitly addressed the holding of the previous

determination, and stated that *res judicata* prevented consideration of any claim as it pertained to

the period under consideration.).

There is "a fine line between considering a claimant's medical history solely for the

purpose of establishing whether the claimant was disabled and actually reconsidering that

evidence" in a manner that will be recognized as a *de facto* reopening. *Kaszer*, 40 Fed. Appx. at 695. Here, the ALJ properly maintained the distinction between proper consideration of plaintiff's medical history and impairments as they related to the current application and reopening the prior application.

The ALJ declined to consider all of the medical evidence from the prior application. In doing so he did not consider the opinions of Drs. Houk and Eisler. These were opinions of consulting examiners who provided a "snap-shot" assessment of plaintiff's impairments and resulting limitations as they existed during the previously adjudicated period. They were in large measure based on an examination of plaintiff and the information he conveyed during that examination. Given the longitudinal perspective of these snap-shot assessments and the valid invocation of *res judicata*, the ALJ cannot be faulted for failing to discuss each of these assessments at a level of detail that would jettison the expressed invocation of *res judicata*. *Cf. Kaszer*, 40 Fed. Appx. at 695 (the ALJ's analysis of the claimant's medical history and "careful consideration of all the evidence" from the prior adjudication constituted a *de facto* reopening of the claimant's prior application); *accord Young v. Bowen*, 858 F.2d 951, 955-56 (4th Cir. 1988) (the ALJ's implicit consideration of the claimant's condition during the prior period and his "weighing the full range of medical evidence" permitted consideration of a *de facto* reopening); *Crady*, 835 F.2d at 620 (finding a reopening where "[t]he ALJ made an extensive analysis of the claimant's medical condition ... [for] a period as to which no benefits could have been awarded absent a reopening"); *Lewis*, 236 F.3d at 510 ("*Res judicata* does not apply when an ALJ later considers 'on the merits' whether the claimant was disabled during an already-adjudicated period.").

Nevertheless, the ALJ sufficiently recognized the import of plaintiff's entire medical record and evaluated it as it related to the existence of plaintiff's mental health impairment and the concomitant limitations bearing on the period of disability under review. A prior claim will not be deemed to have been reopened "merely because the evidence reviewed by the ALJ included evidence of the claimant's condition at the time of the previous application." *Girard v. Chater*, 918 F. Supp. 42, 44 (D.R.I. 1996). In other words, "[a]n ALJ 'is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application.'" *Id.* (quoting *Frustaglia v. Sec. of Health & Human Servs.*, 829 F.2d 192, 193 (1st Cir. 1987) and citing *Groves v. Apfel*, 148 F.3d 809, 810–11 (7th Cir. 1998) ("There thus is no absolute bar to the admission in the second proceeding of evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits."); *Burks–Marshall v. Shalala*, 7 F.3d 1346, 1348 (8th Cir. 1993) ("[T]he mere allowance of evidence from the earlier applications, without more, cannot be considered a reopening of the earlier case.").

Here, the ALJ considered treatment records from Irene Stacey and the opinions of plaintiff's treating psychiatrist Dr. Simmons which overlapped with the prior period. This expressly was undertaken for contextual purposes and essentially was necessary to meaningful consideration of plaintiff's impairments and limitations during the period under consideration. As noted above, the ALJ was not precluded from discussing this evidence and his handling of it in a manner that maintained the invocation of *res judicata* cannot be found to be error.

**B. Substantial Evidence Supports the ALJ's Decision**

Moreover, the record contains substantial evidence to support the ALJ's findings and conclusions. Plaintiff's contention that the ALJ's decision is not supported by substantial evidence is threefold. First, he argues that the ALJ improperly disregarded the medical opinions of Dr. Simmons. Second, the ALJ improperly determined plaintiff's RFC, disregarded the testimony of the vocational expert and relied on an incomplete hypothetical question. Finally, plaintiff argues that the ALJ erred in determining that his impairments in combination did not meet or equal a listed impairment. Each of these is unavailing.

The ALJ did not err in attributing limited weight to Dr. Simmons' opinions. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984). But it equally is well settled that the ALJ retains the discretion to assign "more or less weight [to such a report] depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429. And where the record contains additional medical evidence that contradicts or undermines a treating physician's assessment, the ALJ retains discretion to assign an appropriate level of weight to each assessment and resolve the conflicting evidence. *See Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985) ("in light of this conflicting medical evidence, the [ALJ] could reasonably find the lack of clinical data, indicating active phlebitis, outweighed the testimony of Newhouse and her treating physicians.").

The ALJ was well within his discretion to afford "little weight" to Dr. Simmons' opinion regarding plaintiff's disability. Dr. Simmons signed several statements of disability on plaintiff's

behalf, including a series of ERAFs submitted to the Pennsylvania Department of Public Welfare and a psychiatric assessment in the form of a questionnaire. The ERAFs, which stated that plaintiff was "temporarily disabled" due to symptoms of bipolar disorder, have minimal value here where the Department of Public Welfare applies standards for determining disability that are not identical to the standards applied under the Act. *See e.g., Hartranft*, 181 F.3d at 362, *Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984) (recognizing different standards apply in determining disability under the Act and Pennsylvania's workers compensation program and opining that an ALJ may reasonably decline to assign significant weight to medical records where the opinions therein relate to workers compensation claims).

Moreover, the ERAFs were "check-the-box" forms unaccompanied by explanatory narratives or medical evidence to substantiate the conclusions reached therein. Such form reports are at best weak evidence of disability and when they are unaccompanied by thorough reports, their reliability is suspect. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").

Dr. Simmons' assessments also were undermined by the notable absence in the treatment notes of (1) ongoing complaints by plaintiff of his condition worsening, (2) repeated requests for changes in his medication regimen, (3) reports of frequent or ongoing disturbances at work or (4) reports of episodes of decompensation. To the contrary, Dr. Simmons' treatment notes indicate plaintiff was busy at work, and that his mood generally was stable and it even improved during a two-month period of full-time work. In this regard the medical evidence established that as a

general matter plaintiff's mood was stable and his overall condition was well-controlled by prescribed medications.[9]

The different standards of disability, the form of Dr. Simmons' reports, the lack of corroborating verification in the treatment notes and the ability to control the limitations through medication provided substantial evidence to discount Dr. Simmons' indication that plaintiff was disabled. The ALJ did not err, therefore, in giving Dr. Simmons' opinions little weight.

Dr. Simmons' opinion that plaintiff was unable to sustain full-time employment also was inconsistent with the other evidence of record. Plaintiff's own accounts of his functional abilities undermined Dr. Simmons' assessment that plaintiff could not meet the rigors of substantial gainful activity. Plaintiff testified that he had been employed by the same employer for over four years, with a near perfect attendance record and with only one documented instance of inability to interact appropriately with a supervisor. Plaintiff believed his supervisors to be generally pleased with his work. He was able to maintain regular work attendance even in his mother's three-month absence and indicated he would be capable of performing necessary household chores if he lived alone. Although plaintiff sometimes experienced confusion or disorientation while driving, his continued employment as a delivery driver demonstrated that he possessed the requisite concentration to perform satisfactorily his designated job tasks. Plaintiff also testified that he had only missed four days of work in a four year period, two of which were due to his attendance at Social Security hearings, and he independently maintained a regular work schedule

---

[9] Of course, the ability to control a limitation with medication or treatment is a factor which the ALJ may consider in assessing the severity of an impairment. *Welch v. Heckler*, 808 F.2d 264 (3d Cir. 1986). And it equally is well accepted that if a condition can be controlled with medication or treatment, it is not disabling under the Act. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993); *see also* 20 C.F.R. §404.1530(b).

while his mother was away. Plaintiff further testified as to his recreational involvement in golf and, until recently, in bowling, and occasional outings with friends.

The accounts of plaintiff's level of functioning in the treatment notes from Irene Stacey and plaintiff's own accounts of his work-related and social functioning were indicative of someone who could meet the demands of gainful activity. The ALJ thus had a sound basis to conclude that plaintiff's work-related performance and attendance record as well as his accounts of social functioning provided evidence of his ability to engage in sustained work activity, properly respond to work pressures and interact appropriately with supervisors.

Plaintiff next contends that the ALJ improperly determined his RFC and attacks the ALJ's hypothetical question posed to the VE. His argument is based on the reports of his mental health treatment providers and consultants, all of which he insists support the conclusion that he cannot work full-time and has additional limitations not accounted for in the RFC.

Plaintiff's argument is unavailing. When the record contains conflicting or inconsistent medical opinions, an ALJ is generally free to choose which one to credit and which one to reject. *Brown v. Astrue*, 649 F.3d 193, 196-197 (3d Cir. 2011). In doing so, however, an ALJ must explain his or her reasons for crediting one medical assessment over another. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505-506 (3d Cir. 2009); *Reefer v. Barhart*, 326 F.3d 376, 381-382 (3d Cir. 2003). The ALJ provided an explanation for formulating plaintiff's RFC that was supported by substantial evidence.

The ALJ had substantial evidence to conclude that plaintiff has the RFC to perform medium work limited to work of a semi-skilled nature, with no more than occasional interaction with supervisors, coworkers and the general public. It is apparent that the ALJ considered the medical evidence of record and found that Dr. Link's assessment that plaintiff was able to meet

the basic mental demands of competitive work on a sustained basis to be more consistent with the record as a whole. As explained above, the record also sufficiently undercut the disabling limitations identified by plaintiff's mental health treatment providers. Thus, the ALJ was within his discretion to assign little weight to the limitations rendered by those providers and draw instead on the assessment provided by Dr. Link.

The contention that plaintiff did not have a RFC consistent with the findings of the ALJ likewise is misplaced. Formulating a claimant's RFC is an administrative finding, not a medical finding. Such an undertaking is specifically reserved for the ALJ. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007) ("An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because that determination is an administrative finding reserved to the Commissioner."). Plaintiff's assertion that he could not work full-time sufficiently was undermined by the medical evidence as a whole and plaintiff's own testimony relating to his employment, social functioning and recreational activities. Thus, substantial evidence supported the ALJ's formulation of plaintiff's RFC.

Against this backdrop, plaintiff's contention that the ALJ failed to submit a hypothetical question that took into account all of his established limitations is without merit. Plaintiff points out that the VE testified that an individual who would need to miss one day of work per week could not engage in substantial gainful activity. The VE further testified that an individual with poor or no ability to deal with work stresses, interact with supervisors, make decisions, follow work rules, behave in an emotionally stable manner or demonstrate reliability would be unable to engage in substantial gainful activity.

The difficulty with this position is that there was no objective evidence of record to support the contention that plaintiff would miss one day of work per week. In the course of

plaintiff's four-year employment he had missed only four days of work, two of which were to attend Social Security hearings. Furthermore, he was able to maintain regular attendance for three months while his mother was out of town. Similarly, the record is replete with evidence of plaintiff's ability to deal with work stresses, interact appropriately with supervisors, make decisions, follow work rules, behave in an emotionally stable manner and demonstrate reliability.

It is well-settled that the ALJ may disregard any answer to a hypothetical question provided by the vocational expert that is not credibly supported by the record. *Jones*, 364 F.3d at 506. As noted above, there was substantial evidence to support the hypothetical question posed to the VE and to disregard the variations that deviated therefrom.

Finally, the ALJ had substantial evidence to conclude at step three that plaintiff's combination of impairments did not meet or medically equal a listed impairment. To be found presumptively disabled, a claimant must show that all of the criteria for a listing have been met. 20 C.F.R. §§ 404.1525(a), 416.925(c)(3).

To meet the required level of severity necessary for a disability finding under Listing 12.04, Affective Disorders, plaintiff must satisfy either the requirements of subsections "A" and "B", or the requirements of subsection "C". 20 C.F.R. pt 404, subpt. P. app. 1, §12.04 (2004). To satisfy the A criteria, the claimant must prove he has medically documented persistence of one of three disorders, which includes bipolar disorder. To satisfy the B criteria, a claimant must show that his mental impairments result in at least two of the following: (1) "marked" restrictions in activities of daily living; (2) "marked" difficulties in maintaining social functioning; (3) "marked" difficulties in concentration, persistence, or pace; or (4) "repeated" episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04B. To satisfy the C criteria, a claimant must show a chronic disorder of at least 2 years'

duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04C.  A marked limitation is one that seriously interferes with a claimant's ability to function independently, appropriately and effectively on a sustained basis.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C.  Episodes of decompensation are exacerbations or increases in symptoms or signs accompanied by a loss of adaptive functioning.  *Id.*  Repeated episodes of decompensation means three episodes within one year, or on average of once every four months, each lasting for at least two weeks.  *Id.*

It is always the burden of the claimant to present evidence that an impairment or combination of impairments meets or equals a listed impairment by presenting medical findings equal in severity to all of the criteria for a listed impairment.  20 C.F.R. §§ 404.1526, 416.926.  The ALJ is not required to use particular language or adhere to a particular format in conducting his analysis, but must merely ensure that there be sufficient explanation to provide meaningful review of the step three determination.  *Jones*, 364 F.3d at 505.

Because plaintiff failed to demonstrate that his impairments satisfied either all of the criteria in both paragraphs A and B, or the criteria in paragraph C, plaintiff's argument that he met or medically equaled Listing 12.04 is unavailing.  While the ALJ found that plaintiff had symptoms of bipolar disorder, it readily is apparent that the ALJ determined that the evidence of

record fell woefully short of meeting plaintiff's burden to establish disability at step three.  As explained above, the medical evidence did not support a finding of "marked" limitations in two of the B criteria.  Instead, the medical evidence as a whole provided substantial evidence to support the opposite determination.

Moreover, the record also failed to contain sufficient evidence of episodes of decompensation.  Plaintiff had only one inpatient hospitalization in 2007, and ongoing complaints by plaintiff of his condition worsening, requests for changes in his medication regimen, reports of additional disturbances at work or reports of episodes of decompensation are notably absent from all aspects of the record.  Therefore, the ALJ had substantial evidence to conclude that plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining concentration, persistence or pace; moderate difficulties in maintaining social functioning; and no repeated episodes of decompensation.  In short, the medical and other evidence of record failed to establish the criteria needed to meet Listing 12.04.  Accordingly, the ALJ did not err in not finding plaintiff disabled at step three.

## IV.    CONCLUSION

It is well-settled that disability is not determined merely by the presence of impairments, but by the effect that the impairments have on an individual's ability to perform substantial gainful employment.  *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).  In making assessments of the impact impairments have on a particular individual's ability to do work related activities, determinations of credibility are committed to the sound discretion of the ALJ and must be upheld where there is substantial evidence to support them.  *Hartranft*, 181 F.3d at 362.  Here, the record contained substantial evidence to support the ALJ's assessment of the medical evidence of record as a whole and plaintiff's subjective complaints.  Accordingly, the

Commissioner's decision must be affirmed.

For the foregoing reasons, plaintiff's motion for summary judgment will be denied and Commissioner's motion for summary judgment will be granted. An appropriate order will follow.

Date: February 27, 2014

s/ David Stewart Cercone<br>
David Stewart Cercone<br>
United States District Judge

cc:     Christine M. Nebel, Esquire
        Colin Callahan, AUSA

        Via: CM/ECF Electronic Filing